We'll call the case of Reppert v. Marino et al., Mr. Orlowski. Good afternoon, Your Honor. I'm Richard J. Orlowski. I'm here on behalf of the appellant, Laurie Reppert. I would like to reserve three minutes for rebuttal. That request will be granted. Thank you, Your Honor. Your Honor, we present to you a rather unusual case because the simple fact is that this is a case where Allentown had a policy, a de facto policy of investigatory, non-probable cause, inferred consent strip searches in paddy wagons after they stop people for suspicion of using drugs. And what do you cite to the record for that proposition? Well, Your Honor, I would start with page... page 15 of the appellee's brief where they say, there is no dispute that the evidence deduced during discovery established that the Allentown Police Department had a long-standing custom of conducting consensual strip searches in the back of paddy wagons. Oh, for consensual... What's illegal about that? And that's the fact issue which is at issue in this case is there really consent for these strip searches in the back of paddy wagons on the streets of Allentown? No, but I ask you what you would cite for your proposition that this municipality had a practice and custom of unconstitutional action. And you cited me only to a sentence in the other party's brief that acknowledges that they conducted consent searches in the back of police vehicles. And we had a testimony of Sergeant French prior to the trial. We had the deposition of Sergeant French who testified that they've been doing it, I think he said since 1992, that they always done it that way and they don't need to get more... Conducted consent searches? They characterize them as consent searches. Well, what do you have that characterizes them differently? Well, here was our conceptual problem. And this came also in the French deposition. Under Allentown policy, they're supposed to do an incident report. So every time there's a police interaction with a citizen involving a substantial interaction other than the morning or afternoon, they're supposed to write a police report. What they did in this case and what they did in every other one of these purported consensual search cases is they didn't do incident reports. They said, if we don't find anything, we don't do incident reports. There were 10 officers acting at this scene. All were obligated by their policy to do incident reports. Nobody does it. So there was no record of the stop of Ms. Ruppert in this case? There was no record that was easily obtainable. And that's part of the procedural posture of this case. What happened was I wrote a letter to the chief of police. I got ignored. I sued him for ignoring us. They actually went back through radio dispatches, confirmed that this happened, had everybody identified from the radio. At that point said, where are your incident reports? And made them do incident reports. They gave me those statements by those witnesses, and that's what caused us to drop the chief and the assistant chief and concentrate on the actors of this incident. Well, let me ask you, assume for the purpose of argument that they had a policy of stopping and script searching a lot of people. If this policy was carried out with the consent of the person searched, and that was the issue which the jury resolved, finding it was a consent search, then what is the constitutional violation, even if assuming for the record they shouldn't have had this policy, but the policy was carried out only with the either implied or actual consent of the person searched? Well, and that gets to the heart of our dispute with Judge Gardner's determination in this case. Basically what happened was... Look, could you answer my question? My question is pretty simple, I think. I'm sorry if I confuse you. And that's this, if they had a policy which you disagree with, if you say the policy was unconstitutional. But if that policy was carried out only with the expressed consent or implied consent of the person searched, then how is there any violation of the plaintiff's rights? Because under Justice Clarence Thomas' opinion in U.S. v. Rodney, you can't have... Yeah, but he wasn't a justice at that time, which is important. I think he was. I think he was... He was? He was a dissent in any event, wasn't he? No, I don't... That's not how I remember it. It was dicta. It was dicta. It was dicta. I think it's dicta. In Rodney's case. And where he was... But he was sitting in the D.C. Circuit. By designation. He was a Supreme Court justice. At least that's my recollection. Okay, but he was sitting in the D.C. Circuit. In the D.C. Circuit. And he basically said, at some point we suggest a body search would become so intrusive that we would not infer consent to it from a generalized consent regardless of the stated object of the search. So you can't have implied consent for a strip search of body cavity. All right. Did you ask that the jury be so instructed? Basically, yes. What happened was Judge Gardner wanted to take two to three days off in the middle of the trial to go over all the objections to various points for charge. We didn't think that was in the best interest of our clients, so we agreed that we would preserve one issue and one issue only, and that is, can you have implied consent? And we spent the day in front of Judge Gardner arguing that it was a charge concept. And we cited him, Justice Thomas' opinion, and that specific language that I just read to you. You can't have implied consent because it's the most intrusive type of search that is possible. And that's where I think we drew the line in the sand because it was that important. If you have implied consent, any time there's a strip search, they always get to say, well, they participated in the search. But the evidence here from the defendant's point of view was that it wasn't implied. It was express consent. And did you ask the jury to determine whether or not they found consent, but whether they found it was impliedly or consent or expressly given? That was not a sub-issue in the interrogatory. The judge, with all due respect, I think you got it wrong. I just want to read from what Sgt. French said. This is his testimony that he said I read. Question. You didn't say, Ms. Redbird, I'm asking for your oral permission to conduct a strip search. You never said that, correct? Answer, no. Question. So you personally never got consent? Answer. Did I use the word may I re-search you? Absolutely not. No, I did not. Did I imply, though, what was going to happen? Yes, I did. Question. Did you, in any way, do you have any recollection that you ever used the words to my client's strip search? Answer, oh, no, probably not. So that was the, there's only, Officer Kuma, who did the search, said, I never got consent from her. Sgt. French, I just testified, he said he never got consent. Everybody said, she should have known we were putting her in the paddy wagon. Common sense, that's what was going to happen to her. The only one, there was one officer, and one officer only said he got consent, and that was Officer Marino. And that's why this issue was so crucially important. Expressed consent, he said he got. Yeah. Marino is the only one who suggested he couldn't remember exactly how he got consent. But he said he got expressed consent. Everybody else said, no, I didn't. I just read to you what French said, who was in charge of the investigation, who was there and on the scene. They implied consent, and they needed the instruction on implied consent. I think the law is very clear that the more intrusive the search, the more clear you have to be. You didn't ask for an interrogatory to the jury as to if they find consent, whether it was found impliedly or expressly. No, because Judge Gardner's charge took that issue away from them. When did you object to the charge, before or after it was given? At the charge conference, after it was given, and then the jury came back with a question about what's his consent for the strip search. And I begged the judge, the judge, you've got to make it a higher standard, and I have the site in here somewhere if I can see. You've got to tell this jury that it's not the same as consent to a vehicle, and he wouldn't do it. He kept the same verbiage over and over again. So if we would find that that charge was in error, then we go back to the charge. Is it harmless, or is it prejudicial error? It's prejudicial error, because that would, if justice… How is it prejudicial? Because the jury was allowed to determine that implied consent is the standard, when it's not the standard. Where does that get you in this case? It gets us a new trial. On everything? A new trial against all the individual defendants, and then you have to address the Monell question. And I think the Monell question was an easy question. Does it keep alive, the Monell question? Do I think it keeps alive? Does it keep alive? If you said… If we say that there was an error in that jury instruction, and we think that that error was so significant that it was prejudicial error, reversible error, does it keep alive your entire case? The answer is maybe. It depends how you… You could split the maybe. You could say the case only survives against the individual defendants. I'll give you a new trial. Judge Gardner was right on the Monell question. I mean, just saying. But I don't see how the facts of this case, given the fact that they were implementing the policy, which we're challenging as unconstitutional, I think it should go back on all the cases. Let me ask you on another point. You made a Rule 50A motion after you presented your case to get a judgment as a matter of law on the fact that the stop was illegal. Yes, Your Honor. Okay. And that motion was denied. Right. You did not read… Apparently, you did not read… No. We didn't go back to Judge Gardner. You didn't go back to Judge Gardner and move a second time for a 50A motion. Procedurally, that may have been an error. If it was an error, does that preclude that question from being resubmitted? Can we consider that question? I think you can consider it. If you're deciding to send it back for a trial, Judge Gardner should have the guidance on that issue because this is a racial profiling case, which we haven't gotten to discuss yet. But this stop was between my client as a white lady who was in a downtown neighborhood meeting a Hispanic female and a black male. My officer friend said, Question, did you not tell me in the deposition that race was one of the factors you considered in what was going on that night? Answer, I certainly did. And I'm not going to back away from that statement now. Now, the other officer did sort of back away from it. And that's in the record at Volume 2, 203A. And Officer Cedars said, In Allentown, when you see white people, now this is not a quote, but when you see white people with black males or Hispanic females, you know the white person is a drug user and the black male is a drug dealer and the Hispanic female is a drug dealer. And that's what's precipitated this whole thing. And that's why I thought we should have gotten a direct verdict on the no probable cause, because the racial profiling vitiated everything that came afterwards. Let me answer this. Just to back up on the consent, Justice Thomas, to the contrary, notwithstanding, in our Third Circuit case, Good v. Dauphlin County Social Services, we held even an intrusion of the magnitude involved, a strip search of one's body, is constitutional if state secures consent as long as the consent is freely given. And there's nothing to indicate that consent has to be implied or expressed or anything. Well, how is the consent freely given if it's not expressed? And that's what Justice Thomas is saying. You can't imply, infer consent from other actions. It's got to be expressed. That's what Justice Thomas is saying. And there's nothing inconsistent with what you just read from your hand. Well, we went on to say that consent to search must be freely given. The plaintiff's verbal consent need not be explicit in order to be valid. A person's consent may be inferred from the person's words, gestures, and conduct. It appears Third Circuit law does not make a distinction between express or implied consent to a search. It has to for a strip search. I mean, it doesn't have to. That's not this panel. That's a prior panel that we're brought by. With all due respect, Your Honor, the law is, even for probable cause, you can't just have probable cause to strip search somebody. You need particularized probable cause. It's a heightened standard when it's a strip search. Not according to this case in the Third Circuit. Well, we'll see what this panel does with it after you consider Justice Thomas's opinion. Thank you, Mr. Miloski. Thank you, Your Honor. Mr. Weehan. May it please the Court, my name is Donald Weehan, and I represent the defendant appellees in this case. And let me start off by saying that Mr. Orlowski's recitation of the facts is not accurate, and he's played fast and loose with the facts and the evidence that was presented before the court. First of all, this was not a racial profiling case as it was tried. Mr. Orlowski raised a racial profiling claim in his complaint, but that was dismissed on summary judgment, and he has not taken an appeal from that decision. With regard to the consent issue, Rodney does not stand for the proposition that consent to a search, a strip search or a body cavity search must be explicit. Rodney was a case involving the scope of the consent or the scope of the search that general consent to a search did not include consent to a strip search or a body search. And that's what that case stood for. Now, the proposition, the point for charge that I submitted to Judge Gardner in which he accepted and which he instructed the jury on was simply that consent can both be expressed and implied, and it can be implied from someone's words, gestures or conduct. And Judge Gardner, I believe, himself in the charge conference said that if somebody nods their head in response to a question of, you know, will you consent to a search, that that can be construed as consent. You don't have to say the magic words that yes, I consent or yes, you may search me. That expression such as nodding the head or be my guest, you know, can we search your car, and they point to the car and say be my guest, but that can be construed as consent. And that's simply all that was instructed to the jury. And it's basic, you know, that's well-settled law that there was nothing controversial here. And Mr. Hrabowski cited no case law whatsoever that consent to a strip search must be expressed and cannot be implied. There is no case law that he cited. And Rodney is simply inapplicable. Now, in his reply brief, he attempts to sort of morph this whole issue into suggesting that the consent that she gave wasn't adequate to be a body cavity search, that merely consenting to a strip search wasn't enough to consent to a body cavity search. That issue was never raised by Mr. Hrabowski before the court. He never argued it to the jury. He never submitted a point for charge on that. That is completely after the fact. And it's raised, it's not even in his appeal. It's raised for the first time in his reply brief. And I would submit that he's weighed that. And, you know, why should Mr. Wynn, why shouldn't there be a more explicit consent for a strip search and or a body search than for other searches? Well, I think there has to be consent to that particular type of search. You can't simply say, do you mind if we, you know, search your pockets and then... He said, do you mind if we search you? Well, they went beyond... And didn't she say in this, didn't she say her response was something to the effect, well, you're not going to find anything? She said that to French. Okay, she did say that. She said that to French. And, you know, she never, they never asked her if she could, if they, if she would consent to a body search, did they? Yes, they did. Both Marino and Faulkner both asked her, would you consent to a strip search? Marino said, I use the word strip search. And she, he said in response to that, she said, she pulled her clothing and started to pull her shirt off. And he said, no, no. Did they ever, did they ever say, can we search your body cavities? There's no testimony that they ever said, can we search your body cavities? They said, what Faulkner said, Officer Faulkner said, I explained to her, you can be hiding drugs in a place where I can't check you where a female officer could. I'm going to have a female officer come to the scene and remove your clothing and search you better than I can search you now. I made it very clear. I made it clear to Ms. Reppert that night. I made it clear that I said that removing clothing and deposition. I might have even used the word strip search. I might not have. But I made that point very clear that she was going to go in the back of the paddy wagon and have her clothes removed and be searched. Did he use the word body cavity? No, but I think that that's sufficient. The real problem with this case is that when you take everything that you, that was, that's on the record, as to why the police stopped this car, an inviting question, based on looking at a significant number of cases as a member of this court and prior stages of my legal career, I don't think that there is the level of probable cause or reasonable suspicion that the officers in Allentown, who were all trying to do a good job in a tough area of town with constant complaints, had what was necessary to stop this car. And if you go from that fact to then carry out what has to be the most intrusive kind of search that law enforcement can undertake, it seems to me that if we had any test, if we had any statement of the law, that there has to be more particularized suspicion to allow either a body search or certainly a cavity search under the law of this circuit. Well, let me first of all say I respectfully disagree that they didn't have reasonable suspicion to stop this vehicle and detain. I think they had more than enough to indicate that there was a drug deal going down here. And when you look at what Terry v. Ohio requires, they had more than what Terry v. Ohio was involved in that. I mean, Terry v. Ohio was simply an officer seeing people walking over to the window, appearing in the window of a store and walking back and discussing it with their colleague. And then another one would walk over, look in the store and go back. And the Supreme Court said, based on this officer's considerable experience, that was enough to suspect that they were casing the store and that criminal conduct was involved. Does Unitherm preclude us from reviewing that issue at this stage? Yes, it does. Mr. Orlowski failed to renew his Rule 50 motion in a post-verdict motion. And so that precludes your review of this issue. And I might add on the issue of consent. Mr. Orlowski is basically making a sufficiency of the evidence claim that there wasn't enough evidence that the consent wasn't adequate and that there wasn't sufficient evidence to show that there was explicit consent. He never raised a Rule 50 motion either prior to verdict or after verdict on that issue. He challenged the issue of the motor vehicle stop at the time of the close of the evidence and never renewed it afterwards. But on the issue of consent, he's really saying that the consent here wasn't accurate. There was insufficient evidence of valid consent to a search. He's raised no sufficiency of the evidence claim. There was no motion for a judgment as a matter of law either before or after the verdict. We're going to run out of time here. And this case really troubles me for much the same reason as it troubles Judge Fischer. But it's a matter that we've segued to it, I think, but we haven't talked about it yet. The judge here allowed a witness, Devaney, to testify over strenuous objection. Now, one of the things Devaney said was that Ruppert told him that she consented. Correct. And I don't understand them, the folks on the other side of the aisle, to be complaining about that. But he, this witness, went on to talk about drug dealing, about Ruppert being drug dealing and drug user and a lot of stuff. And what Devaney, what this amounted to, the judge allowed Devaney to confirm what the police said they suspected, even though the police did not have at the time any of this information that Devaney was laying before the jury. And this turned out to be very potentially prejudicial since the jury was asked about reasonable, whether it was a reasonable suspicion. And defense counsel, I'm sorry, plaintiff's counsel did ask questions of Ms. Ruppert about what she told the police about whether she had recently had drugs or not. The defense counsel on cross-examination insisted on asking her whether she was a drug user. And the plaintiff's counsel objected to that and originally the defense counsel withdrew it. But then he asked the same question again and again there was an objection. We're talking about a distinction between asking what happened on this night and what she said to the police and what the police said to her and what the police knew at this time versus whether or not she was a drug user. Now, just a minute. The judge says, I want to read you what he says and I want to ask you whether it makes sense to you. Judge says, I agree with Mr. Wyan that this opens the door enough for him to clarify through the witness two things exactly what it was she told the officers and whether or not she what she told the officers was true. The former has relevance for the officer's probable cause and reasonable suspicion and the latter does as well in the sense that if she was in fact a recent drug user, the jury could draw an inference that she was in fact there on a drug transaction in that area where drug transactions take place around that telephone, where drug transactions are made, driving around the block with people who jump into her car in the form of drug transactions because the issue was not whether she was in fact doing what they suspected that she was doing, but whether their suspicion was reasonable. Now, does that make any sense to you? And explain to me why something that was not known to the officers at the time can provide an inference of whether the officer's suspicion was reasonable at the time. Well, let me say this. I don't think that and the judge gave a limiting instruction, regardless of what he may have said in his ruling on this objection. He did give a limiting instruction that they should not. The jury should not consider this evidence in terms of the talk and deciding whether the officers had reasonable suspicion of probable cause. And he said it's not relevant to that. And it's not prohibitive of that. So he did instruct them on that. Can you give me a cite to that? I can't. Yeah. The other thing, though, is that the plaintiff in her own direct testimony testified that I don't do drugs. I didn't have any drugs on me. I don't do drugs. And that's what the judge said. That opened the door. Because now when Devaney comes in, he says, I mean, there are a couple of reasons that Devaney's testimony was relevant. But one, it contradicted her testimony that I don't do drugs and I've never, you know, I haven't done drugs. It also explained how and why would she confide in him that she had been stopped by the police, that she was there to get drugs from this individual? His answer to that was, well, we used to do drugs all the time. She used and this was her regular drug dealer. And she routinely gave this woman rides in exchange for small amounts of drugs. And he said, and I know that because I was with her when she did it. What's the relevance of all this to an issue in this case? Well, first of all, it went to impeach her credibility. She said I was there to give this woman a ride to go to her to deliver birthday gifts to her sister. I wasn't there to buy drugs. I don't do drugs. And that was her story. That's what she told the police. That's what they knew. And that's what she that's what she testified in trial to. But none of that has any relevance to whether or not the police had the right to stop her in the first place. But it has relevance as to what she was doing there, whether she's telling the truth. I mean, this is after the fact. She doesn't get it. She doesn't have a license to get on the stand and lie. And then we get to impeach her if she does that. And we had debate to impeach her and say, no, that's not why she was there. And the judge said, you can't take that into account when you decide probable cause of reasonable suspicion. But you can't decide at the very least. It's relevant as to I mean, well, as to whether there are any damages here, what she was doing. And, you know, they testified that she consented. Did the court say that Devaney's testimony as to the male's conduct when he got out of the car at the Hess store, it was relevant and could be considered as to the circumstances of that set of facts. Faulkner testified that when the male got out of the car, he looked around nervously as if he was afraid of being watched. And he walked into into the shadows and started walking into the well-lit front entrance of this apartment building. And he said that appeared to be suspicious to me. Well, why should you be able to use Devaney's testimony to to support that suspicion? Well, Mr. Orlovsky attacked that as either being fabricated or misrepresenting what you know, or misconstruing what he had seen. And he attacked Officer Faulkner in suggesting that either that didn't happen or you somehow misinterpreting it or exaggerating it. Devaney testifies that that she says to him that when that that record said to him that just before this male passenger got out, he said, be careful. You know, it's hot with hype with 5-0 around here, meaning that the police are watching. I mean, first of all, it's an admission on her part as to what happened in the car. And secondly, it's relevant to show that Faulkner wasn't making this up, that it indeed was that that statement was consistent with his getting out and then looking around nervously as if he's afraid of being watched. It is true that in addition to a relevance objection, there was a four or three objection to Devaney's testimony. Right. Well, that is that assuming it had any relevance and as the judge apparently thought it did. When I say it, I mean things that the police did not know on their night in question. It was a four or three emotion that even assuming there was some minimal relevance, it was overturned, overshadowed by its prejudicial effect. Well, the judge. First of all, let me go back. And the the limiting instruction is at 762 and 763 of the appendix. The to answer your question with regard to the. I'm sorry. What was the testimony was objected to four or three grounds as well. It was it was objected to on four or four grounds. But four or four B includes a reference to four of the three. And the judge said, I don't think four or four B really applies here because they're not trying to prove character. And then she acted in conformity with their with. But if it does, I still think that it meets the exception to four or four B and it meets the four or three test. And he went through and he gave all his his analysis on the record. Thank you, Mr. Lee. Thank you, Mr. Lasky. That limiting instruction. According to my recollection, the judge went back into limiting instruction and told the jury that the veins testimony could create a reasonable suspicion, suspicion for the initial stop. Mr. Wien grew your attention to volume five, seven, six to pay where he goes back and takes it away. Is it volume five, seven, six, five, eight? And it's important to understand that the vein not only was a prejudicial witness, but he was fabricating testimony. And his first version to the police when he volunteered and showed with the police was he said she told him he was forced to strip. And that's at the record volume five, seven, eight to a. At that point, he was asked by the police. We don't like that story. Go back and ask if you can send it. So purportedly, he went back the day he went back. And nobody knows where he went back. Nobody knows. But he came back a second time and said, oh, yeah, she told me she consented to this. The jury heard all that. The jury heard all that. OK, so they can make it on this consent question. They can make their credibility determination. Right. If it wasn't. But basically, what they do with the vein is they go back to their character. They made her a drug dealer. Now, he made the he says, I opened the door. I asked him, why are you here? Because you're a do-gooder. He says, yeah, and she steals money from churches and goes to churches and uses the money for drugs. They were just blackening her character and Judge Gardner allowed it to happen. And basically, all they ever had was a hunch that this was a drug transaction. But the vein you get and their investigation show their hunch was wrong. What the vein he gave them was a validation that all the hunch was right. Somehow, this drug just disappeared and the police didn't find it. And that's why it was so highly prejudicial, because it blackened her character. It was prejudicial and deprived us. You know, the issue of the vein testimony wasn't relevant on the issue that night because the police didn't know about it. Mr. Orlowski, if you had a chance to write our opinion as to what the policy should be in a circumstance like this, when somebody like Miss Ruppert was stopped and they didn't find anything in the car, they didn't find anything on her, what would we say as to how far you could go and search a person? That's right. I think once they searched the car and didn't find anything, once they did the pat-down search, there's no reason for the search to continue. And it's a whole fabrication that there's an implied consent. Now, Mr. Wien said, people nod their heads, yes. Well, that's explicit. You nod your head, yes. The police say, and his other example was, we want to search your car, be my guest. That's explicit consent. This lady never consented. She didn't know what she was getting into. April Coomer, the lady who did the search, she said, I can't take my clothes off. This floor is dirty. She said, you have to, you're in here, you have to do it. There's evidence that she conceded that she consented. She told Devaney, have I got the name wrong? Yeah, Devaney is on both sides of that issue. Devaney is, and that's at 5, Volume 5, 7, 8, she said no, she said she was forced to strip. After, asked by the police to go back and clarify it, I think it was Officer Tom Fosage, he came back with the opposite story. He was just telling them whatever they wanted to hear. Why that was so, I don't know, but that's what was happening here. Thank you for your consideration, Your Honor. Thank you, Mr. Orlowski. We thank both counsel for, as you know, very well done, and we'll take the matter under investigation. Please be seated. Thank you.